The prisoner was indicted at the Circuit Court, held for Norfolk county, in October, 1811, for the wilful and malicious murder of Richard JBowden.
Being arraigned, the prisoner filed three pleas, which are as follow.
“1st Plea. And the said Samuel Myers in his proper person comes, and defends the force, felony, and murder, &c., and whatever else he ought to defend, and for plea saith, that he the said Samuel Myers ought not now to be charged with the murder aforesaid of the said Richard Bowden aforesaid mentioned in the indictment aforesaid, because he saith that the borough of Norfolk is a borough of the commonwealth of Virginia duly and legally incorporated, having a legal cor-189 poration *court held by a mayor, recorder, and aldermen, who are justices of the peace of the said commonwealth for the said corporation ; that any one of the said mayor, recorder and aldermen is duly an chorized and required by law to take cognizance of treasons, murders, felonies, or other crimes or offences whatsoever against the said commonwealth committed or done within the said corporation, and have authority to commit any person, not being a slave, who shall be charged before him with any such treason, murder, felony, or other crime or offence whatever against the said commonwealth committed or done within the said corporation, to the jail of the said corporation, if in his opinion such offence ought to be enquired into in the courts of this commonwealth ; that upon such commitments the said mayor, recorder, or alderman is directed by law to issue his warrant to the sergeant of the said corporation requiring him to summon at least eight if so many there be of the justices of the said corporation, to meet at their court-house on a certain day, not less than five nor more than ten days after the date of the said warrant, to hold a court for the examination of the fact, which courts consisting of five members at least are required by law to consider whether as the case may appear to them, the prisoner should be discharged from further prosecution, or may be tried in the corporation or superior court. And the said Sam-190 uel *Myers further saith, that he the said Samuel Myers being a free white person, and not a slave, heretofore, to wit, on the twenty-fifth day of May, one thousand eight hundred and eleven, at the bor *52 ough aforesaid, was charged by the name and description of Samuel Myers before John E- Holt, esquire, one of the aldermen of the said borough, with having on the twenty-fifth day of May, in the year of our Bord eighteen hundred and eleven, between the hours of six o’clock and eight o’clock in the morning, in the store house of Richard Bowden in the said borough of Norfolk, feloniously, wilfully, and of his own malice aforethought killed and murdered the said Richard Bowden, who was then and there in the peace of God, and of the commonwealth, and being so charged before the said John E. Holt as an alderman of the borough aforesaid, it was the opinion of the said John. E. Holt as alderman aforesaid, that the said offence with which the said Samuel Myers was then and there charged before him the said John E. Holt as alderman as aforesaid, ought to be enquired into in the court of the said corporation (which said court is one of the courts of this commonwealth), whereupon he the said John B. Holt as aider-man aforesaid, afterwards to wit, on the same day and year aforesaid at the borough aforesaid, and within the corporation aforesaid, took the recognizance of all material witnesses to appear before the 191 court of the *said corporation, to give evidence against him the said Samuel Myers, and immediately by his warrant committed him, the said Samuel Myers, to the jail of the said corporation, and moreover issued his warrant to the sergeant of Norfolk Borough requiring him to summon the aldermen of the said borough, to meet at the court-house, on Eriday, the thirty-first day of May, one thousand eight hundred and eleven, and then and there, to hold a court for the examination of the fact, with which the said Samuel Myers stood charged as aforesaid. And the said Samuel Myers further saith, that at the court so summoned, and held on the said thirty-first of May, one thousand eight hundred and eleven, and in the thirty-fifth year of the commonwealth, for the examination of him, the said Samuel Myers, so charged with the murder aforesaid,, of him the said Richard Bowden, which said court consisted of more than five members, to wit, of William B. Bamb, mayor, John Nevison, recorder, and William Vaughn, Buke Wheeler, Miles King, John E- Holt, Richard E- Bee, and Miles King, Jun. aider-men, he the said Samuel Myers was set to the bar of the said court in custody of the jailor of the said corporation, and charged with the murder aforesaid, whereupon sundry witnesses were sworn, and examined in the premises, and the said Samuel Myers heard in his own defence by his counsel, on consideration whereof it was the 192 opinion *of the said court that he the said Samuel Myers was not guilty of the murder aforesaid, with which he stood charged as aforesa-id, and ought not to be remanded to the superior court for trial therefor, which he the said Samuel Myers is ready to verify, and prove by the record thereof.
“And the said Samuel Myers further saith that the said Richard Bowden named in the indictment and the Richard Bowden named in the record are one, and the same, and not different persons ; that he the said Samuel Myers named in the indictment, and the said Samuel Myers named in the said record, and acquitted as aforesaid by the said corporation court of the murder aforesaid, are one and the same person and not different persons, and that the murder charged upon him the said Samuel Myers before the said corporation court, and the murder charged upon him the said Samuel Myers in the indictment aforesaid, are one and the same, and not different acts, and this he is ready to verify ; wherefore since he the said Samuel Myers hath already been heretofore acquitted of the murder of the said Richard Bowden aforesaid, he prays the judgment of the court here, if he the said Samuel Myers should be again charged with the same murder of which he hath once already at another time been acquitted.” 193 *2d Plea. [This plea is precisely like the first in all its averments, until it comes to the opinion of the examining court, when it proceeds thus :] “In consideration whereof, it was the opinion of the said court, that he the said Samuel Myers was not guilty of the murder aforesaid, with which he stood charged as aforesaid, and ought not to be removed to the superior court therefor, but ought to be tried for the offence of manslaughter before the superior court of law directed to be holden in the town of Portsmouth, in the county of Norfolk, on the 22d day of October, then next following, which he the said Samuel Myers is ready to verify, and prove by the records thereof.”
[This plea then concludes with the same averments as to the identity of Bowden, Myers, and the act of murder as are contained in the first plea.]
3d Plea. “And the said Samuel Myers for further plea (by leave of the court) saith that, he ought not now to be charged with the murder and felony aforesaid, charged upon him in the indictment aforesaid, because he saith that he the said Samuel Myers, by the name and description of Samuel Myers heretofore to wit, at a court of aldermen of the borough of Norfolk, summoned according to law for the examination of the said Samuel Myers for the murder and felony aforesaid, and held on the 31st day of May, in the year of 194 our *Bord 1811, at the court-house of the borough aforesaid, before William B. Bamb, mayor, John Nevison, recorder, William Vaughan, Buke Wheeler, Miles King, John E- Holt, Richard E. Bee, and Miles King, Jun. aldermen of the said borough, was duly charged, examined and tried for having, on the 25th day of May, 1811, between the hours of six and eight o’clock of the morning of that day, in the store house of Richard Bowden in the said borough of Norfolk, feloniously, wilfully, and of his malice aforethought, killed and murdered the said Richard Bowden who was then and there in the peace of God, and of the commonwealth, and that he the said Samuel Myers, upon this trial and examination was *53 duly and legally acquitted by the said court, of the said murder and felony with which he was then and there so charged, and was adjudged by the said court not to be guilty thereof, and this he the said Samuel Myers is ready to verify and prove by the record of the said Borough Court of Norfolk. And the said Samuel Myers further saith, that the said Richard Bowden named in the said indictment, and the said Richard Bowden named in the said record of acquittal, are one and the same, and not different persons ; that he the said Samuel Myers named in the said indictment, and the said Samuel Myers named in the said record and acquittal as aforesaid by the said corporation court 195 of the felony and murder ^aforesaid, are one and the same, and not different persons, and that the felony and murder charged upon him the said Samuel Myers before the said corporation court, and the felony and murder charged upon him the said Samuel Myers in the indictment aforesaid, are one and the same, and not different felonies; and this he is ready to verify. "Wherefore since he the said Samuel Myers hath already been heretofore acquitted of the felony and murder of the said Richard Bow-den aforesaid, he prays the judgment of the court here, if he the said Samuel Myers should be again charged with the same felony and murder of which he hath once already, at another time, been acquitted.”
To these pleas the attorney for the commonwealth demurred generally, and the prisoner joined in demurrer.
The court adjourned to the general court these questions for their consideration. “First, whether a court of examination hath power to acquit a prisoner charged before them with murder, of the murder with which he stands so charged, and to remand the said prisoner to be tried in the superior court for manslaughter on account of the same homicide. Secondly, whether a prisoner acquitted by the examining court of murder, and remanded to be tried before the superior court for manslaughter on account of 196 the same homicide, but indicted *in the said superior court for murder on account of the same homicide, is entitled to be bailed by such superior court after the discharge of the grand jury, who found no other indictment against him.” Not only these questions, but generally “any and all the other questions of law arising upon the said pleadings” were adjourned by the circuit court to the general court, “with the consent of the said Samuel Myers the prisoner.”
This case was argued at the November term, 1811, of the general court, by Nicholas, attorney general for the commonwealth, and by Taylor, Tazewell, and Wirt for the prisoner.
Nicholas. The first and most important point to be discussed is, whether the examining courts can discriminate between the higher and lower offences—can acquit of the higher grade, and send on for the lower. This question arises from the second plea filed by the prisoner.
The plea of autrefoits acquit must consist of two matters, 1st. Matter of record, to wit, the former indictment and acquittal and before what justices, and in what manner by verdict or otherwise. 2d. Of matter of fact, to wit, the identity of the person acquitted, and of the fact of which he was acquitted. 2 Hale P. C. p. 241. As to the 197 *first matter he r ef erred to Hawkins, B. 2, ch. 35, sect. 1st, to shew that to make the plea good, the defendant must shew that he has been found “not guilty” on an indictment free from error, and well commenced before a court having jurisdiction of the cause. 4 Black. Com. 335 also proves that the plea cannot be good unless the court had competent jurisdiction of the offence. He contended that the examining courts had not competent jurisdiction finally to acquit, before the act of Jan. 1804, gave them that power. Before that period they were merely intended to examine into offences, and to prevent an innocent man from being harassed by enquiries before single justices. They could not acquit, because they could not condenan. See Tucker’s note to 4 Black. 335. The life of a prisoner was never brought into jeopardy by an examination before the county court, and therefore the plea of autrefoits acquit was not a good one. The principles on which that plea is allowed by common law, is that a man should not be brought into danger of his life for one and the same offence more than once. Hence it is that the finding ignoramus on an indictment by a grand jury does not operate as an acquittal, 2 Hale, 246, and he may be again indicted, for he has not been legitimo modo acquietatus. So also, in the case of a coroner’s inquest, finding facts not amounting to felony, he may notwithstanding be indicted. So it is, where the party has been acquitted on an insufficient indictment, 198 there the plea of autrefoits acquit *is not good. Ib. 248. Thus it was in "Virginia before the act of 1804. What difference does that act make? The only new provision in that act is to be found in the 3d section, !2 Rev. Co. 38,) by which it is declared that if any person “be acquitted, or discharged from further prosecution” by the proper examining court, he shall not be again examined, or tried for the same offence, but may plead such acquittal or discharge in bar. It is understood that this provision was introduced in consequence of decisions of the district courts that a discharge by the examining courts was no acquittal. That section then containing a new principle, and the examining courts being unknown to the common law, and deriving their whole authority from the statute, the prisoner must bring himself within the letter oí the law. Although the examining courts are now vested with the acquitting power, it does not follow that they have the power of discriminating between different grades of the same offence. The statute gives the one power; it does not give the other, nor can it be implied. The examining court is directed to consider, “whether the prisoner may be discharged from further prosecution, or may be *54 tried in the county, or corporation, or district court. ” The power to discharge from further prosecution does not involve the power to discriminate. If they do not consider that he ought to be discharged, two other alternatives present themselves : viz. to send 199 on for trial either to the inferior, *or to the superior court. In ascertaining which of these two alternatives should be adopted, he admitted it might be necessary to discriminate, so far as to ascertain whether the prisoner should be tried in the one court or the other, and so far that power is given, on the principle that it is necessary to carry power actually given (to wit, the power of remanding) into effect. But where the whole crime and every grade of it, as is the case with every grade of felonious homicide, is triable in the superior courts only, there the power to discriminate between those different grades is not given, either expressly, or impliedly, because it is not necessary to carry into effect the given power of remanding to the superior court for trial.
He urged as a strong circumstance, that the court was to be held “for the examination of the fact,” which seemed to exclude the idea of their being empowered to distinguish between different 'degrees of criminal motive. The terms “discharge from further prosecution” clearly import, a total discharge, and not a partial one, except in the cases already mentioned. In a case like this, said Mr. Nicholas, the first thing that the examining court has to enquire into is this, “Shall the prisoner, who is charged with felonious homicide, be discharged from further prosecution ?” If they think that he is not altogether innocent, if they think that he is guilty of manslaughter only, they cannot discharge him from further prosecution. The next enquiry is, “to what court shall he be 200 *sent for trial ?” In answering this question, it is not necessary to decide on the grade of homicide, because each grade of it is to be tried in the superior court. He argued that the very construction of the courts, prove that they are not vested with this important power of discriminating between different degrees of an offence. The courts are composed of plain men not versed in the nice distinctions of the law : they are to meet within ten days at the most, after the commitment, so that if their decision be absolutely final on the higher grades of offences, the accused will frequently escape merited punishment, because there is not time to collect' evidence entirely satisfactory, which may more easily be done when the superior court has general cognizance of the whole offence. Grand juries and petit juries, it is true, have the discriminating power, but it is by them exercised under the control of judges supposed to be well acquainted with legal distinctions. For these reasons he thought that the demurrer to the second plea ought to be sustained, and that this court ought to certify that the examining court have no power to acquit for murder, and remand for manslaughter.
2dly. He objected to this court giving any opinion on a point not specially adjourned. An adjourned case is not like an appeal. In the latter, the whole record must be looked into; in the former only the point adjourned. He therefore thought it improper to go 201 into the enquiry, *whether the attorney for the commonwealth did right in demurring to the first and third pleas, or whether he ought not to have pleaded nul tiel record, or whether he ought not to have objected to the reception of the pleas themselves, on the ground that the record did not support them.
3dly. But if the whole record is to be looked into, then it became his duty to contend that the first and third pleas were bad on demurrer. A demurrer admits such facts to be true as are well pleaded, but the matter of the first and third pleas is not well pleaded, and therefore is not admitted to be true. A general demurrer in criminal cases is the same with a special demurrer in civil cases. The statute which declares that no defect in point of form shall be regarded, unless the causes be specially set forth in the demurrer, does not apply to criminal cases. You may therefore regard, in this case, all the defects in the pleas, although they are not specially set forth. At common law a party might take advantage of any objection, however trifling on general demurrer, except duplicity: 1 Chitty, 639. This common law doctrine is still in force in criminal cases. The first defect to be noticed in these pleas is, that the record of the proceedings of the examining court is not made a part of the plea. The prisoner ought to plead the record certain, and - have the record in court, “for it is part 202 of the prisoner’s plea.” (See 2 *Hale, 243, 2 Hawk. ch. 35, s. 2.) How can the court judge whether the acquittal be by a court of competent jurisdiction, unless they see the record ? Every plea must be certain and so pleaded as to be capable of trial. (1 Chitty, 513, 520.) Now these pleas are not capable of trial, because the record of the examining court is not a part of the plea, as it should be. Again, the pleas are defective in not stating that the party was discharged from further prosecution. They only aver that the court was of opinion, that he ought not to be sent on to the superior court. In Rastall’s Entries, the plea is that the prisoner was, “in an adequate manner acquitted,” there is no such averment in the first and second pleas, and although in the third plea there is such an averment, yet the record is not made a part of the plea. He objected to the first plea, because it did not state the whole substance of the record : it garbled it, by averring that it was the opinion of the court, that he ought not to be sent on to the superior court for murder, and by omitting to aver that they considered he ought to be sent on for manslaughter. Another reason why the record of the examining court ought to be a part of the plea, is that oyer could not be demanded of the record. (5 Bac. Abr. 1 Term Reports,-) A false plea is cause of demurrer, if it appear by the pleader’s own shewing. (1 Chitty 521.) Now here the first and third pleas are false, because they state an absolute' acquittal, whereas the record *55 shews that there was none such, as 203 would have been manifest if the ^record had been part of the plea. He also objected to there being three distinct pleas of autrefoits acquit. At common law, he said, the defendant could not plead several pleas as of right, (1 Salk. 218, Willes, 533,) and that the statute which gives the right of pleading double, applies only to civil cases. He objected lastly to these pleas, because they were repugnant one to the other: the one stating, that it was considered that he was not guilty of murder ; another that he was not guilty of murder, but guilty of manslaughter. Repugnancy in pleas is not admissible. (3 Wilson, 145, W. Black. Rep. 905, SBac. 447.) Pleas of an inconsistent nature may be pleaded by the statute of Anne, but that applies only to civil cases. He referred to 2 Strange 1044, where it was decided that a defendant could not plead double in a qui tarn action on the statute of gaming, the statute for the amendment of the law excluding popular actions.
Robert B. Taylor for the prisoner, premised that the question respecting the discriminating power of the examining courts need not in reality be discussed at the present time, because it is now admitted on all hands that those courts have at this time the power of general acquittal, and the demurrer to the first and third pleas admitted the truth of them ; that is, admitted that the prisoner had been generally acquitted of the murder, and of the murder and felony with which 204 he stood charged. *But as the question respecting their discriminating power, had been specially referred to the circuit court, and had been here argued, he would proceed to investigate that subject. The second plea avers that the examining court did discriminate by acquitting the prisoner of the murder, and sending him on for trial for manslaughter, and the demurrer to that plea, properly brings on the question as to their power of doing so. To make the plea of autrefoits acquit good, three things must concur, first that the offence of which he has been acquitted is identically the same as that for which he is indicted : secondly, That the court be competent to acquit; and thirdly, That there has been an acquittal. In this case they all concur. The prisoner was indicted for the murder of Bowden, the plea avers that it is the same murder of which he had been formerly acquitted ; the court was competent, and the plea set forth an acquittal. He contended that a court of record has no right, incidentally and collaterally to look into the gounds of a judgment of another court of record even if it is inferior ; the decisions of all tribunals are presumed to be right until they are reviewed, and reversed by a superior tribunal in some legal way, such as by writ of error, supersedeas, or appeal. Hence he inferred that the circuit court has no right to find fault with the judgment of the examining court: the circuit court must presume the judgment of the examining courts to be right, 205 and must *take up that subject where that court has left it: it must say that the prisoner is acquitted of murder, because the record says so. To say that he is not acquitted of murder is to contradict the record, and to review and reverse the judgment of the examining court in an incidental manner, when it is not brought up to be reviewed and reversed. He admitted that if a tribunal exercises an usurped jurisdiction, all acts done by it are void, and coram non judice, but if it has jurisdiction, then its acts must be presumed right until reversed. If an admiralty court gives a judgment in ejectment it is void, so if a common law court gives judgments in a prize cause it is void, because in each case the jurisdiction is usurped; but an erroneous judgment of a legal jurisdiction is not void, but voidable merely. If a court which does not possess appellate jurisdiction, could enquire into the judgment of another court incidentally, that very enquiry would give such court an appellate jurisdiction. Now the circuit courts can by no means be considered as appellate courts in capital cases ; they have original jurisdiction only, and must always take up the subject where the examining courts have left it, the records of which furnish to the circuit courts the charter of their authority, but the power now contended for, would make them appellate. He said that whenever the tribunal is the dernier tribunal, its decisions however erroneous are never examinable, or reversible. This position is 206 true, not only as it regards the ^supreme court of appeals, but also as to the circuit courts where their judgment is final, and even as to single magistrates whose judgment is under ten dollars. The examining courts exercise their power of acquittal finally : there are no proceedings known to the law by which the judgment of an examining court can be reviewed. The means to reverse it being denied, it follows that the end is not provided for. The writ of error at common law is allowed to a prisoner to reverse a judgment against him, but there is no common law, or statutory writ by which to reverse the judgment of an examining court. The writ of error is not allowed to the crown, because an acquittal on an erroneous indictment is no bar to a future prosecution. There is a good reason why a writ of error cannot issue to an examining court, for as soon as the decision is made, the court is at an end, and there is no court to certify its proceedings. But if the proceedings are reversible, then the circuit court must say that the proceedings are either right or wrong, or partly right or partly wrong. If the decision of the examining court for Norfolk borough has been wholly right, then you must adhere to that decision, and every departure from it is wrong ; you must therefore indict for manslaughter only. If the decision has been wholly wrong, then it is void ; you must act as if they had done nothing, and therefore you cannot indict at all. But if the decision be partly right and partly wrong, then reject what is 207 wrong and ^retain the right. What part is wrong ? If the part which acquits for murder be wrong, then reject it, and what remains ? Only the part which *56 sends on for manslaughter. Then you can only indict for manslaughter. If the acquitting part be right, and the part which sends on for manslaughter be wrong, then reject the latter part, and there is a final acquittal of the murder.
Mr. Taylor insisted that the examining courts have the power by law to discriminate between the grades of offences, and to acquit partially. The arguments and the authorities of the attorney general go to shew that a court has not competent authority to acquit unless it has also power to comdemn ; but such arguments cannot apply to examining courts because they have express authority by statute to acquit, and no power to condemn. It is true that the law does say that a court shall be held “for the examination of the fact,” and also declares that if they are of opinion that “the fact” may be tried in the county court, &c., the party shall be sent there for trial. But it is not thence to be inferred that the court has not power to consider law, as well as fact. There are several terms in the act which prove that the court must consider the law, and must determine whether the “fact” be lawful or unlawful. “Criminal offence” is used in the same section, which certainly involves the idea of law as well as fact, for “offence” means an act contrary to law. So the 208 word *“offence” is used in the 4th section. So it is said in the 1st section “as the case may appear to them,” they shall decide. The case is certainly compounded of law and fact. But the word fact in the one clause is explained by the same word in the next. How is a person to be tried for a fact unless it be contrary to law ? Suppose a sheriff charged with the fact of homicide. Positive proof is produced that he hung a man. If the examining court can only enquire into the fact of the homicide, he must be sent on for trial, although he has in his hand, a record of a competent court, sentencing him to be hung, and appointing him the executioner, which completely justifies the act. The justice of peace who commits, and the grand-jury who finds the bill have both power to decide on the law ; why shall not the examining court so decide? Why should a restriction exist with regard to a court possessing a power to acquit, when it does not exist with regard to other tribunals who have no such power ?
The examining courts have the general power of acquittal expressly given to them by statute. Where is the clause by which that power is limited ? There is none, and hence it is to be inferred that no restriction on that acquitting power does exist. The greater power includes the lesser: the power to acquit altogether, includes the power to acquit in part. Suppose an acquittal 209 of each *grade of the offence from the highest to the lowest, would not that be the same as a general acquittal ? '
The analogies of. the law prove that the examining courts may discriminate. The grand jury may find ignoramus as to murder, and “a true bill” as to manslaughter. The petit jury may acquit of murder, and find the party guilty of manslaughter. Why not these courts? There is no danger in granting the power. Is it more dangerous to give the general power, than the lesser?
He contended that the third section of the act of 1804 proved that they had the discriminating power. It is not to be supposed that the legislature would use tautologous words. The words “acquitted or discharged from further prosecution” in that section, do not mean the same thing. A man may be “acquitted” of the particular crime charged, but not “discharged from further prosecution” of every part of the offence.
Mr. Taylor said, if acts are to be done, which cannot be done without exercising the discriminating power, the power itself is given. He illustrated the position, by supposing the case of a man charged with stealing a pocket handkerchief from the person. It is either petty larceny or it is robbery. In the former case, he must be sent to the quarter sessions ; in the latter, he, must be 210 remanded *to the superior court. The examining court must here discriminate, because otherwise they cannot decide where the prisoner is to be tried. The court must also decide whether he shall be bailed or not. If he is guilty of robbery, bail is refused ; if of larceny, it will be granted : here they must again discriminate.
He referred to Sorrel’s case decided in the general court in 1786. It was there decided that the examining courts had a power of general acquittal, and Judge Mercer said that in the case of the King v. Davis it was decided by the general court that they had the power of partial acquittal. From that day it had been generally supposed that they had the power, till Judge Tucker’s note to Blackstone p. 435 was seen, which induced the legislature in January, 1804, to silence the question by passing the third section of the law already mentioned.
Tazewell for the prisoner. He contended that the circuit court did right in receiving the three pleas. He would venture to hazard an assertion that the court of King’s Bench allowed double pleading in all cases before the statute of Anne, but it was unnecessary to consider whether it would be allowed in civil cases and therefore he declined the discussion on that subject, but with respect to criminal cases, and more especially those which are capital, he strenuously urged 211 that double pleading is, *in England, the birth right of the subject: from the earliest periods of English law, from the days of Alfred to this time, it was the absolute right of the prisoner to plead as many pleas as were necessary and proper for his defence, and he boldly challenged any lawyer to produce a single dictum of the worst of the English courts, in the worst of times, to prevent a prisoner from pleading doubly in bar of the prosecution. The reason on which the statute of Anne purports to have been made is, that as duplicity was not allowed in any one plea, and it was frequently proper that several defences should be made, it was deemed right to allow those several defences to be made in several pleas. The reason ap *57 plies as strongly to criminal as to civil cases, for what can be more reasonable than that a prisoner who has been formerly convicted of the same offence with which he is charged, and who also knows that he has not been guilty of the offence at all should be allowed to plead “not guilty,” and “autrefoits convict” at the same time ? If then the common law had not given the right of double pleading to prisoners, surely the courts ought by a liberal construction of the statute of Anne, to extend the benefit of it to criminal cases.
But at common law double pleading is allowable. If a prisoner has been convicted, and has craved the benefit of clergy which has been extended to him, this circumstance may be pleaded at the same time that 212 he pleads *“not guilty.” So a pardon may be pleaded with the general issue. He referred to Coke’s Entries, 355. a. 356. a. and to Crown Circuit Assistant, p. —, to shew instances of double pleading. 1 Hale, 467, on an indictment for murder, the prisoner may plead not guilty as to the murder, and a pardon for the interfectio felónica, or manslaughter. 2 Hale, 239 ; ib. 248. If a special plea, whether of law or fact, as a plea of pardon in an indictment, or a release in an appeal, or autrefoits acquit, or attaint, be found against the prisoner, he shall be allowed to plead over to the felony not guilty, and this in favorem vita;. If then a prisoner may plead a special plea in bar, and the general issue, why not plead several special pleas in bar ? 2 Hawkins, ch. 23, sect. 128-137, and ch. 34, was cited by him to prove that a prisoner might plead as many several pleas in abatement as he thought proper, unless they be repugnant to each other—that they may be all pleaded at the same time even though they do not require the same kind of trial, as one by the record, another by the country; that if the pleas in abatement are all triable by the country, the defendant must, at the same time, plead with them all his matters in bar, and also plead over to the felony ; and that by the better opinion, where the matter in abatement is to be tried by the record, the defendant ought at the same time to plead over to the felony ; that divers pleas in bar may be pleaded at the same time with the general issue, and that in appeals 213 of *death, a release and not guilty may be pleaded, and the plea of “autrefoits convict on the party’s own confession,” and “not guilty” may also be pleaded. Rastall’s Entries, 49. a. b. Two pleas in abatement, and two special pleas in bar were pleaded at the same time. In this country the practice in the district courts has been to allow several pleas in bar, and the general issue at the same time. In Bailey’s case before the district court of Williamsburg, in 1798, the prisoner pleaded two several pleas in bar and the general issue : the pleas were received, and the attorney for the commonwealth replied nul tiel record to the two special pleas. He said that the cases cited by Mr. Nicholas from Salkeld, Willes, and Strange were not applicable to this case, because they were all in fact civil cases.
Mr. Tazewell controverted the proposition | laid down by Mr. Nicholas, viz. that in criminal cases, defects in point of form may be noticed on general demurrer; on the contrary he insisted that no defects of form in the pleas ought to be taken advantage of, on demurrer, unless they are alleged specially as causes of demurrer. It is true that in indictments, great strictness has always been observed, and that the statutes of jeofails do not extend to indictments, and therefore an indictment defective in point of form is not aided by a verdict; but the reason why they do not so extend, is to be found in the 214 ^'tenderness felt by the courts for the lives of the subject: that rule is adopted in favorem vitae. But it does not follow that because the statute of jeofails in favorem vitae don’t apply to the accusation, therefore it don’t apply to the defence ; that construction would be against life. If defects in point of form might be taken advantage of against the prisoner on general demurrer, the consequence might be that his life might be endangered by mispleading, which is not allowable. 2 Hale, 257. He might be entrapped b3' the commonwealth. The plea of not guilty is generally put in ore tenus—no regard is paid to form: the attorney might demur generally, and the court regarding form on this general demurrer would decide against him on this plea, on the decision of, which his guilt or innocence depends, and thus hang him for his mispleading. Erom these considerations, he inferred, that even if double pleas are not allowable, the fault cannot be noticed by the commonwealth, because that is not specially assigned as cause of demurrer. He also observed that it is now too late to object to the pleas because double, for this reason, that they have been received by the court, and the question before this court is not whether they ought to have been received, but whether each plea is in itself good.
As to the repugnan cv of .the pleas ; repugnancy is matter of form and cannot be 215 noticed on general demurrer. *The demurrer must be considered as a separate general demurrer to each plea, and as such the truth of each plea is admitted; there cannot therefore be a repugnance between them, because if so, one of them must be false. Besides it is too late to object to them for repugnancy ; if repugnancy is a fault, it is a ground for not receiving them, but here they have been received. He contended however that repugnancy in pleas in bar was in fact no objection at all: it results from the right to plead doubly, that the prisoner has a right to plead repugnantly. In England, payment and non est factum cannot be pleaded to a deed, because the defendant cannot plead two pleas without leave of the court who will take care not to permit him to plead inconsistently; but here the right to plead doubly is given in civil cases by the statute, and does not require the permission of the court; here therefore a man may plead payment and non est factum. In criminal cases, as before shown, the defendant has a right to plead doubly without asking permission, therefore he may plead repugnantly. *58 The pleas of “autrefoits convict” and “not guilty” are certainly repugnant. So also the plea of a release (on an appeal) and not guilty, and yet they may of right be pleaded together. 2 Hale 255, 6, 7. Hawk, ut supra. In Bailey’s case Judge Tucker dissuaded the attorney from demurring, and advised him to reply nul tiel record, which shewed that he had no objection to receiving repugnant pleas. The cases cited by Mr. Nicho216 las *from 3 Wilson, 2 W. Black. Rep. and Bacon, were civil cases in which the defendants asked a favour, and the court would not allow the pleas because repugnant; this was on motion, not on demurrer, and they do not apply for the reasons above stated. He contended that it was the fair exposition of Hawkins’s doctrine (ut supra) that repugnancy would only vitiate pleas in abatement, and not pleas in bar: this was strengthened by Stanford p. 82. Pleas in abatement are dilatory, and do not go to the merits of the question, and therefore ought not to be contradictory. But are these pleas repugnant? The first avers that he was acquitted of murder, but remanded for manslaughter. There is no repugnancy here. The one affirms more than the other, but they are not contradictory. The third plea avers an acquittal of the murder and felony; if there is a repugnance between the second and third pleas the court must elect the one which is most favourable for the prisoner, that is, the third plea which is admitted to be true.
He then examined each plea separately, and contended that each was good. As to the first: it is urged by the attorney general “that the record should be made a part of the plea.” It is not the duty of the prisoner to produce the record which authorizes the district court to try him ; that is the duty of the commonwealth. The court itself and its officers ought to see that they have 217 authority *to try him, and ought to produce the record remanding him for trial, and if by the record he is acquitted, all that can be required of him is to produce the record of acquittal in evidence to support his plea, but not to make it a part of his plea. According to the attorney general’s argument, the verification by the record at the end of the plea, makes the record a part of the plea: if this rule is good, then a verification by any thing else makes the proof a part of the plea: in debt on bond, the defendant pleads that he has paid the debt, which he is ready to verify by the receipt of the plaintiff. Does this make the receipt a part of the record? So in the trial by battle, the defendant verifies by the champion. Is the champion a part of the record?
A profert in curia, and oyer are the only means by which the instrument relied on to prove the plea can be made a part of the record. A profert is never made of a copy, but always of an original paper. Here the original was in the borough court of Norfolk, and could not be produced by the prisoner. And as to oyer, the prisoner cannot crave oyer of a paper on which he himself relies. It is not necessary that the record should be a part of the plea; for if it was, the commonwealth could not reply nul tiel record, which is the proper replication by which a variance between the plea and the record can be taken advantage of. If a record be pleaded in bar, 218 in the same *court, the other party shall not plead nul tiel record, but shall have oyer, but if it be in another court he shall plead nul tiel record, and a day given to procure the certificate of the record. 2 Hale 241. All that Hale means by saying that the record is part of the prisoner’s plea is that the contents of the record, and not the record itself, should be made a part of the plea. The record is evidence to prove the plea, but not a part of it. In Rastal, p. 361, the conclusion is merely a verification, and not a verification by the record. It is admitted that the record should be set forth in certainty, but it is not necessary that it should be set forth totidem verbis : its effect is sufficient. (3 Saund. --•.) Neither is it necessary that a discharge in technical language, or the “ quod eat sine die,” should be stated. If it was stated in the plea, and the record should not support it, then upon the replication of nul tiel record, the plea would be destroyed. A man’s life might then be a second time jeopardized in consequence of the ignorance of the clerks of examining courts, who do not know how to record a discharge in technical language. In this plea, the opinion of the court is set forth, and then his acquittal of the murder, and surely this is enough. But however necessary the “quod eat sine die” may be in England, it is not necessary here as applicable to the examining courts; the court itself is sine die ; it is functus officio, and expires as soon as the business for which it was convened is done. At any rate, both of these defects (if they are defects) of not 219 making the record *a part of the plea, and of the want of a technical discharge are merely formal, and cannot be noticed on general demurrer.
■ As to the second plea : this involves the power of the examining courts to discriminate between different grades of offences. He contended that it must be presumed that what the examining court has done is correct, if they have done an act within the scope of their jurisdiction; there is a difference between a court with jurisdiction giving an erroneous judgment, and a court giving a judgment, even though aright one but without any jurisdiction. In the latter case the judgment is void, and need not be regarded by any other court; but in the former case, the judgment must be deemed right unless it is regularly and directly reversed by a competent tribunal. The examining court of Norfolk borough had authority to discharge, or to remand to the district court or to the county court; they have done both in part, their judgment is therefore within the limits of their jurisdiction. These courts must discriminate in certain cases in which they must decide whether the prisoner shall be sent on to the district or the inferior court. They must decide whether an act is burglary, or petty larceny only : so whether an act be *59 robbery or petty larceny. Murder and manslaughter are species of the same offence— parts of the same act, as much as burglary and larceny, or robbery and larceny. There is no more difficulty in discriminating 220 between *murder and manslaughter, than between the other two species of offences. The examining courts gives the superior courts a license to try the offence, how then can they try a man for a greater offence than the examining courts authorize him to be tried for. A prisoner must be taken by surprise, if he is to be tried for malicious homicide, when he is only sent on for manslaughter.
The analogies of the law are in favour of the discriminating power. The grand jury discriminate : on a bill for murder, they may find ignoramus as to murder, and billa vera as to manslaughter. In such case you cannot try the party for murder. The grand jury have less power than the examining court: they cannot acquit and yet they are supposed to possess nicer discriminating faculties. The petty jury discriminate ; they may acquit of murder, and find guilty of manslaughter. In England the two tribunals must concur, here the three must concur before a man can be condemned.
The greater power includes the less: the power of general acquittal includes the subordinate power of partial acquittal. If there are exceptions to this general power of acquittal, let them be pointed out in the act. Mr. Tazewell said, it was a curious matter of judicial history to trace the progress of these examining courts. They had always been a favourite with the people, and 221 *with the legislature, but the general court seemed to dislike them, and by various decisions the judges had undermined their authority. They had existed in this county since 1705, and perhaps before. In the case of the King v. Davis, it was admitted that they had the right of acquitting partially. Sorrell’s case came on in 1786, when a strong disposition was evinced in some of the court to deny to them that right. In that same year of 1786, the legislature vested them with the power of bailing a prisoner; if they deemed him to be guilty of murder he was not to be bailed, but if of manslaughter only, then they might direct him to be bailed. They thereby gave them directly the power of discriminating in this very case, and consequently disaffirmed the judgment of some of the judges in Sorrell’s case. Thus it stood till 1798, when Bailey’s case was brought on before Judges Prentis and Tucker, of whom the latter advanced the monstrous position that as these courts had not the power to condemn, they therefore had not the power to acquit. He put this idea into a note in his edition of Blackstone. Then came on Shannon’s case, in which Judge Parker said that an acquittal by an examining court was not worth a rush, and in Blakeley’s case from Staunton, the general court decided that an examining court was not an indispensable prerequisite to a trial in the superior court for felony. Thus the power of these courts was reduced to its lowest ebb. The legislature took the alarm, and by the third 222 section *of the act of 1804 put the question as it was supposed to rest for ever.
As to the third plea, Mr. Tazewell referred to his arguments on the first to shew that it was good. The proceedings are substantially set forth. As to its being a false plea, the demurrer admits it to be true. That is said to be a false plea which contains some contradiction in itself, which is not the case here.
Wirt on the same side, with great ability, enforced the arguments of Taylor and Tazewell, but it is deemed unnecessary to report his argument so far as it coincided with those of his associates. He examined Sorrell’s case : he insisted that the question was not deliberately decided ; it seemed to have been a mere conversation amongst the judges on the question whether the indictment for murder was proper : it could not be considered as a decision at all, for Judge Tazewell was willing that the matter should be brought on again in arrest of judgment, if the prisoner should be convicted, and the other four judges were equally divided. If it was a decision, it was directly contrary to the decision in the King v. Davis, reported by Judge Mercer. The case is not like this, for there the examining court did not directly acquit of murder, but here they did. By the law of 1748, manslaughter of a slave by the owner is not punishable, and yet the examining 223 *court sent Sorrell on for manslaughter, and not being discharged from further prosecution for the murder, the general court put him on his trial for murder. But Sorrell’s case is in some degree favourable to the prisoner, for all of the judges there agreed that it was a settled point that the examining court might finally acquit, and therefore the opinions subsequently given by the district courts in Bailey’s and Shannon’s cases, and perhaps that given by the general court in Blakeley’s case, were contrary to law.
He contended that it was clear from the phraseology of the first and third sections of the act of January 1804 (2 Rev. Co. 37-38) that the examining courts have power to acquit for murder and remand for manslaughter. The first section declares “that when any person, not being a slave, shall be charged before a justice of the peace with any treason, murder, felony or other crime or offence whatsoever, &c.” Here murder is not considered as a grade of any species of offence, but as a distinct species : it is placed per se. The third section declares “that if any person charged with any crime, or offence against the commonwealth shall be acquitted, or discharged, &c. &c.” The terms “crime or offence” in this section evidently have reference to the enumeration in the first section. Eet us then transfer the words of the first section to the third, 224 and it will read thus: “that *if any person charged with any treason, murder, felony, or other crime or offence against the commonwealth shall be acquitted, or discharged, &c. &c.” he may plead the acquittal in bar. Thus giving to the exam *60 ining courts by the very terms of the act, the power to acquit for murder, whatever else they may think proper to do as to the felonious killing.
Nicholas in reply. Sorrell’s case is clearly a strong case for the commonwealth; a majority of the court certainly decided that the examining courts had no power to discriminate. Judge Lyons’s argument that the prisoner might be taken by surprise has nothing in it, for murder and manslaughter both resulting from the same fact, and the degree of guilt merely depending on the motive with which the act is done, the prisoner must be ready with the same evidence in the one case as in the other. The same judge was mistaken when he supposed that a man sent up for felony might be tried for treason. The two offences do not result from the same fact (except in the case of petty treason) and therefore such a consequence cannot ensue. The case of Rex against Davis was loosely and orally reported by Judge Mercer, and made no impression on the minds of his brother judges. Why then should it operate on the minds of this court? After the decision of the general court in Sorrell’s case, why did not the legislature give to examining courts the power to 225 ^'discriminate, if they were anxious that they should have the power?—It seems obvious from the act of assembly, that the power given to these courts to acquit, is contrasted with their power to remand. They cannot do both at the same time. They have no power but what is expressly given by statute, or necessary to carry a given power into effect. For this reason, the commonwealth cannot be called on to point out any exceptions to their general acquitting power. —He admitted that if a court having competent jurisdiction gives an erroneous judgment, that judgment cannot be collaterally called in question; but here they have gone beyond their jurisdiction, and so .far as they have done so, their decision is absolutely void. He deprecated the consequences of a decision giving to them the power to discriminate; by their very constitution they had not time to deliberate on the nicer shades of offences, and they were not in the habit of consulting books for the purpose.
On further reflection, he was disposed to admit that in capital cases a man may plead more than one plea at a time, but he insisted that they ought not to be repugnant, and that repugnancy was matter of substance, and therefore may be noticed on general demurrer.
Tazewell urged that by the 12th section of the penitentiary law of 1795, when a person is charged with ' involuntary 225 ^manslaughter, the attorney may waive the felony, and proceed against him for the misdemeanor, or he may proceed against him in the same indictment for both the felony and trespass. By whom is he thus charged with involuntary manslaughter? Not by the attorney, because he does not charge him, until he elects for what he shall indict him. Not by the grand jury, because they do not act until the attorney has filed his bill. He is then charged by the examining court, and this charge pre-supposes that they have the power of discriminating not only between murder and manslaughter, but between the different grades of manslaughter.
This case was argued before, and decided by Judges White, Carrington, Stuart, Holmes, Brockenbrough, Smith, and Allen, on the 19th of November, 1811, and Judge White, the presiding member of the court, delivered the following opinion.
Samuel Myers was indicted before the superior court of law for the said county, for wilfully, maliciously, and of his malice aforethought killing and murdering Richard Bowden.
Being set to the bar, he pleaded three, pleas in bar of the indictment. In substance—
*First—That he had been acquitted by an examining court duly constituted, of the murder for which he stood indicted as aforesaid.
Secondly—That he had been acquitted by an examining court, duly constituted, of the murder charged upon him by the said indictment, and remanded to take his trial for manslaughter, committed by killing the said Richard Bowden.
Thirdly—That he had been acquitted by an examining court, duly constituted, of the murder and felony charged upon him by the said indictment. \
To all these pleas the attorney prosecuting for the commonwealth demurred generally —and Myers joined in demurrer—And because that court was not advised what judgment to give of and upon the premises, and considered the questions arising therefrom, and particularly two, which are specially stated, both new and difficult, it, with the consent of the said Samuel Myers, adjourned the said questions, particularly stated, and all and every other question of law, arising upon the said pleadings, to this court.
By the tenth section of the act concerning the general court, and the sixteenth sec-228 tion of the act establishing the *late district courts, those courts had, and of course the circuit courts now have, a right, with the consent of the prisoner, to adjourn any question of law arising in a criminal case, to this court, to be argued and decided therein.
The power of this court on such adjourned cases, is derived altogether from those sections, and cannot be carried beyond a fair and liberal construction of them. We cannot, therefore, decide any question, which may grow out of the record before us, unless it plainly appears upon that record, liberally construed, that the circuit court intended to ask our opinion upon such point, therefore as the questions submitted to this court are : First, those specially stated, and secondly, those that arise upon.the pleadings, any questions which did, or might have arisen in the circuit court before the making up of those pleadings, are not before this court.
However as questions of that kind have been argued with great ability, by the gentle *61 men on both sides, and as they seem to be in some measure connected with those actually submitted, to us, the court will not withhold its opinion upon them.
First—It is alleged by the attorney general, that a prisoner cannot plead more than 229 one plea in bar, if the pleas *offered to be pleaded be, in contemplation of law, repugnant to each other.
Secondly—That the record pleaded in each of these pleas, or a certified copy thereof, ought to have been produced to the court, to enable it to see that such a record did actually exist, and that in point of law, it offered a complete bar to the indictment. Although these points are somewhat connected with the question submitted to us, and very important in their nature and consequences, yet it is believed that they do not arise upon the pleadings, as they stand upon this record. How can they be taken advantage of upon a demurrer? The demurrer confesses the truth of the pleas. Suppose then for the present, that these pleas are otherwise good, and offer to the court substantial bars to the indictment. Can any thing be more monstrous than to say, that a man shall be hung, when the attorney has confessed upon the record, that he has three different matters of defence, either of which, although they may appear somewhat repugnant, is sufficient in law to forbid it ? Or, that he shall forfeit his life for not producing a record, the existence of which the attorney hath in like manner confessed ? Besides, as to the repugnancy, how can the court perceive it ? This demurrer must be considered as a demurrer to each jilea, and considering it as such, the court cannot, when applying it to one plea, look 230 into any other. *But as to the first of these points, 2d Hale, 239, 24S, and 2 Hawkins, 276, 277, section 128—the same book, 283, section 137, are complete authorities to shew, that although a person indicted of a capital offence, may not plead two pleas, deemed by law repugnant, in abatement, yet with respect to jileas in bar, when the court is satisfied of their truth and efficacy, although they may appear somewhat repugnant, if they do not directly contradict each other, he shall be indulged. For what two pleas, not absolutely incompatible with each other, can be more repugnant than autrefoits' convict, on the prisoner’s own confession, and not guilty? Yet when we recollect how often ignorant and timid men have been coerced or deluded to make such confessions in open court (as for instance in the case of witchcraft) we shall admit not only the humanity, but the justice of the indulgence.
As to the second of these points, the allegation of the attorney, as now modified, seems to be correct; but cannot avail at this time, in this court. Speaking of the plea of autrefoits acquit, 2 Hale, 241, says, “Stumford tells us that the prisoner need not have the record of his acquittal in jioigne, because the plea is not dilatory but in bar.” “But,” adds Hale, “if that should be law, it would be in the power of any prisoner to delay his trial as he pleaseth, by pleading autrefoits acquit or attaint, in another court, and so put the king to reply nal *til record, and then day given over to the next gaoldelivery to have the record, &c. For regularly, if a record be pleaded in bar, or acted upon in the same court, the other party shall not plead nul til record but have oyer of the record: but if it be in another court, he shall plead nul til record,and a day given to procure the certificate of the record, or the tenor thereof:—But it seems that for the avoiding of false pleas, and surmises, and to bring offenders to speedy trial in capital causes, the prisoner must shew the record of his acquittal, or vouch it in the same court.” He then proceeds to shew how either may be done. 231
The first he tells us may be effected, by having the record removed into chancery by certiorari, and having it in poigne. Or by having it sent to the justices suo pede sigilli. And then goes on to say, if the trial is in the King’s Bench, the second may be done, by the court’s granting “a writ of certiorari, to remove the record before that court, in which case the court will respite his plea until the record is removed, that he may form his plea upon it, for the record is a part of his plea, thereupon his plea is put into form, setting forth the record in certain, (as the attorney general has said ought to have been done in this case) by saying, “For this he voucheth the record of the acquittal aforesaid—At the command of the King him-232 self sent here before the *King, and now before the King remaining.” So that the amount of the authority is, that to prevent delay and false pleas—whenever the plea of autrefoits acquit, or autrefoits convict, in another court, is pleaded, the prisoner shall be ready to prove on the spot the truth of his plea, so far as it respects the record of the former trial. For the record is a part of his plea, and the truth of that part must be proved to the court, by a transcript of the record duly certified, or the record itself properly brought before the court, and that if this proof is not instantly given, the court will overrule the plea, although for good cause shewn it will give him time to plead until the record can be procured.
There is, then, no doubt with the court, but that the transcripts o f the records pleaded, or the records themselves ought to have been produced to the circuit court when these pleas were pleaded. 3STor can the court doubt but that they were so produced, not only because the court did not overrule the pleas for want of them, but because the attorney has demurred to the pleas and thereby admitted their existence.
Having disposed of these preliminary points, it seems most proper to take up the questions actually adjourned, in order in which they are presented by the record. 233 *The first of these questions, a question which involves considerations of the utmost importance to the criminal jurisprudence of this country, as well as the fate of the second plea contained in this record, comes before us in this shape :
“Whether a court of examination hath power to acquit a prisoner charged before them with murder, of the murder with which *62 he stands so charged, and to remand the said prisoner to be tried in the superior court, for manslaughter, on account of the same homicide?”
Before we enter upon this subject, it maybe necessary to observe, that the attorney general has never asserted', nor has it entered into the mind of any member of this court, either that the circuit courts possess an appellate jurisdiction over the decisions of the examining courts, or that any court whatever has a right to annul or disregard the unreversed judgment of another court, be it ever so erroneous, when brought incidentally before it, if such judgment was within the jurisdiction of the court which pronounced it. ' The positions laid down by the attorney general, were these: “That the discriminating power contended for is not given to the examining courts either expressly, or by implication, and is not within their jurisdiction. And that not being within their juris234 diction, *if they do attempt to exercise it, their decisions, as to that, are merely void, and binding upon nobody.” And surely if the premises are correct, the conclusion cannot be denied.
When entering into the consideration of this important question it is necessary to premise that these courts of examination are courts unknown to the common law : That they are the mere creatures of the statute law, and cannot upon any principle, exercise any power or jurisdiction which has not been expressly conferred on them by that -law, or which does not result to them as the means necessary to carry the jurisdiction expressly given to them into effect. These powers they do and must possess, but no more.
What then is the statute law upon this subject? What are the powers which it hath given to these courts? And what other powers are necessary to the due exercise of the powers given?
Has the statute law given to these courts as it has to the county and corporation courts, with certain specific exceptions, “jurisdiction to hear and determine all causes whatsoever at common law, or in chancery, within their respective counties and corporations?’ ’ Or has it given to them, as it did to the district courts, and of course now gives to 235 the circuit courts, “Hull '-power to hear and determine all treasons, murders, felonies and other crimes or misdemeanors whatsoever committed or done within their districts?” It is believed it is not. Bet us look into the acts of assembly and see.
By an act passed on the 24th of January, 1804, (2d Vol. of the Revised Code, page 36, chapter 34, section 1,) it is enacted, “That from and after the commencement of this act, when any person not being a slave, shall be charged before a justice of the peace with any treason, murder, felony, or other crime or offence whatever, against the commonwealth, if in the opinion of such justice, such offence ought to be enquired into in the courts of this commonwealth, such justice shall take the recognizance of all material witnesses, &c. And, moreover, shall issue his warrant to the sheriff of the county or sergeant of the corporation, requiring him to summon at least eight, if so many there be, of the justices of the county or corporation, to meet at their courthouse on a certain day, not less than five nor more than ten days after the date thereof, to hold a court for the examination of the fact—which court consisting of five members at the least, shall consider whether, as the case may appear to them, the prisoner may be discharged from further prosecution, or may be tried in the county or corporation, or in the district court, and shall thereupon proceed in the manner 236 as ^prescribed by the act, entitled an act, directing the method of proceeding against free persons charged with certain crimes,” &c.
Bet us stop here and enquire, whether this section gives to the examining court general jurisdiction over the fact and offence charged upon the accused? Surely it does not. It has not general jurisdiction over the offence unless it can hear and determine it—which no person will pretend to say it can do. Ror the moment it has decided that an offence has been committed by the prisoner, it becomes its duty to send him on to another court for trial. Its jurisdiction, then, must be limited. Bet us see to what it is limited. What can this examining court do? So far as this section is concerned, it can do one of three things—first, it is to consider whether the prisoner may be discharged from further prosecution. If the court thinks so, he is discharged accordingly, and there is an end to the matter—but if the court does not think that he ought to be discharged from further prosecution, is it authorized to entertain that prosecution further, to go on further with the examination of the fact? it is not; on the contrary, in that event the court is expressly directed to enquire in the second place, in what court he may be tried, or in other words, further prosecuted. And having ascertained that, the court is expressly directed in the third place, in pursuance of the act to which the section now under consideration 237 *refers, to take proper measures to bring him before that court for trial. It is believed that this is a correct statement of those statutes, and if it be so, is it possible not to perceive, that as the attorney general has observed, the power to discharge from further prosecution and the power to remand for further prosecution are contrasted with each other? That the latter is not intended to be, and in fact cannot be, exercised until the court has decided that it ought not to exercise the former.
As, however, the great weight of the argument in favour of this discriminating power, rests upon the true import of this authority, to discharge from further prosecution, let us examine a little more minutely, what is the natural, correct and necessary meanings of the phrase, discharge from further prosecution. Bet us then suppose that a man is charged before a justice of the peace, with breaking and opening a house, and stealing a pocket handkerchief : the justice, being of opinion that the offence amounted to burglary, commits him for that offense, and sum *63 mons an examining court. But that court, after hearing all the evidence, is satisfied that although the crime was committed, it did not amount to burglary, but to petty larceny only. Or let us suppose that a man is, in like manner, committed for a grand larceny, and the examining court should think him guilty of the fact, but that it amounted to petty larceny only—What would be 238 done *with these men? They would be remanded for trial in the county court. Here is an exercise of the discriminating power, but is there a man alive who can prevail upon himself to believe, that this is a discharge from further prosecution? Or that it proceeds from or is done in consequence of the power to make such discharge? So far from being so, it is an express order that he shall be further prosecuted, and is derived, as will be shewn hereafter, from a different source. How then does this power to discharge from further prosecution prove that the examining court, when it has refused to exercise it, and has actually sent the accused on to another court for trial, has a right to forestall the opinion of that other court in which the law and its own decision has said that trial ought to take place?
But it is said, the major includes the minor; that the power to discharge from further prosecution is the major power, the power to discriminate the minor, and of course included in the other. But it is believed, that the power to acquit generally, is not the major, but the minor power. It is believed to be a self-evident truth, not to be denied by any man conversant in the law, that the power to ascertain the various shades and grades of an offence, which has been committed, is a power infinitely more difficult to execute, and more important in its nature and consequences, than the power to decide, 239 whether any offence *whatever has been committed, and that this is more emphatically true, as it respects the crime of felonious homicide, than any other. How then can it be said, that the former is the major, and the latter the minor power? It is believed, that the converse of the proposition is true.
But it Is further said, that these courts have and do exercise the -power of discriminating between the grades of certain offences as for instance, those which have been mentioned, burglary and larceny. And this is true, but it is not easy to see how it affects the argument—no one doubts but that they may do any act necessary and proper for the due exercise of the power actually given to them. They are expressly directed to send the accused, if guilty, to the court in which by law he ought to be tried ; but, in these cases, it is impossible to ascertain in what court the trial ought to be had, without first ascertaining whether the offence be or be not petty larceny, and so far they may and must discriminate. But how does that prove that in a case not necessary to the exercise of a power actually given, they may discriminate for the purpose of interfering with, and controlling the opinion of that court to which, by direction of law, they send the prisoner for further trial ?
We are also told that this power is given by the third sect, of the act of 1804. 240 That section enacts “tha t if any ^person charged with any crime or offence against the commonwealth shall be acquitted or discharged from further prosecution by the court of the county or corporation, in which the offence is, or may by law be examinable, he or she shall not thereafter be examined, questioned or tried for the same crime or offence ; but may plead such acquittal or discharge, in bar of any other or further examination or trial for the same crime 'or offence, any law, custom, usage or opinion to the contrary in any wise notwithstanding.”
Now upon what principle of construction can this section be said to give a power to acquit or discharge ? Is it not most clearly and palpably predicated on the idea that the power had already been given ? And is it not manifestly intended to declare what shall be the result of that acquittal or discharge, which the court already possessed a right to pronounce? To find, then, the extent of that power to acquit or discharge, we must look into that part of the law which gives it. And when we do so, we discover it is this very power to discharge from further prosecution, out of which the present question has arisen, and which, it is believed, has already been proved not to confer the discriminating power contended for.
But the construction put upon this section is attempted to be further supported, by 241 stating, that any person charged *with a crime or offence, who is acquitted or discharged by the examining court, shall not be questioned for the same crime or offence, and then stating every degree of a crime which grows out of an unlawful act, as forming by itself a separate and distinct crime, and not as forming different degrees of the same crime. Consequently it is inferred, that murder and manslaughter are distinct crimes or offences, although they are alleged, to grow out of the same unlawful homicide. And that therefore, if the examining court acquit a man charged before it with murder, but go on to say that he is guilty of manslaughter, by perpetrating the same felonious homicide, for which he was charged with the murder, he is thereby acquitted of the crime wherewith he stood charged, to-wit, the murder ; and may plead that acquittal in bar, by virtue of this third section. But this is an incorrect understanding of the word crime and offence, as they are used, both by the common law and the statute under consideration. In legal acceptation those words are synonymous terms, although the word crime is often used to denote offences, of the higher grades. 1 Haw. page 1, Blac.. Com. page 4 and 5. In the same fifth page of 4 Blackstone’s Commentaries, we are told;—that crime consists in doing an act, in violation of a public law; and in the-second page of the same book, that the law teaches the grades of every crime, and adjusts to it, its adequate and necessary punishment. Crime or offence, then, is the 242 doing an act, in violation *of a public law; and the different degrees of atroc *64 ity which may attend its commission, fix the the degree of the crime. The killing of a human being, in any case not specially allowed or excused, is a crime distinguished by the name of felonious homicide. But as that crime may be attended with greater or lesser degrees of guilt, these degrees are distinguished by different names and punishments. But still they all constitute the same crime, felonious homicide. And murder being the highest grade, includes all the others. So that a man charged with murder, is charged with every species of felonious homicide. Blackstone, after having in his fourth volume, disposed of sundry crimes of a different nature, in his 14th chap, comes, as he says, to consider “those crimes which in a more particular manner affect or injure individuals. ’ ’
And in the 188th page he proceeds to consider the crime of felonious homicide, that “being, as he says, the killing of any human creature, of any age or sex, without justification or excuse, and this, he adds, may be done by killing oneself or another man.” He then goes on to describe the various species of that crime, and their respective punishments, clearly shewing that in his opinion, felonious homicide was the crime, and murder, manslaughter, &c. &c. its various grades. The meaning put upon these words by 243 the statute *under consideration, is precisely the same. When any person is charged before a justice of the peace with treason, murder, felony or other crime or offence, he is to summon a court to inquire into the fact, which is supposed to constitute that crime; when the court has done so, it is to consider whether he may be discharged from further prosecution. Ror what? Ror every species of crime which might grow out of that fact.—If they do not discharge him, they are to send him to the proper court to be tried.—Ror what ? Ror another offence ? Ror a-crime which does not grow out of the fact, to enquire into which the court was called?—Certainly not; it must be for the criminal act, or in other words, the crime, charged upon him by the commitment and summons which constitute the court, and no other ; and yet they will send him to one or other of the courts, as the circumstances attending that fact make the crime with which he is charged more or less atrocious, as for instance, grand or petty larceny. By crime then, this law does not mean each separate grade of an offence, but the criminal act itself.
This it is believed gives a satisfactory answer also, to the argument drawn from the interpolated reading of the various sections of this act.
The court does not see the force of the argument drawn from the supposed tautology which it is said the construction 244 ^contended for by the attorney general will produce. The expressions, acquitted or discharged from further prosecution, were introduced into the third section very properly out of caution, and are calculated to meet an argument pressed upon the court in this very cause, to wit, that if an examining court should say that a prisoner is not guilty, and actually turn him loose, yet if it does not go on and say on the record, he is discharged from further prosecution, he may be prosecuted de novo.
The argument from analogy is also deemed inapplicable. The grand and petty jury are sworn in a court having general jurisdiction of the crime, and are by the statute and common law charged with every part of it—not so the examining court: we have seen that its jurisdiction is limited.
Besides, it is not correct to say that a grand jury can acquit. It is true if they find ignoramus as to the murder and a true bill as to manslaughter, the attorney cannot try the prisoner for murder on that bill. But if he obtains better testimony, he may send up another bill for murder and try him upon that. —One indictment cannot be pleaded in abatement of another, 2 Hale 239—nor can the return of ignoramus be pleaded in bar.—It is said that he will not be prepared to encounter the charge of malice, and therefore will 245 be taken by surprise. The answer *is, that this can never happen if the court send him up generally for the homicide, as it ought to do.
“But the examining court is an additional barrier erected for the benefit of the accused, ’ ’ and so it is. No innocent man can now be kept in jail more than ten days without a trial. And if his examining court discharges him, he can never afterwards be questioned for the same crime, two great privileges which he did not enjoy by the common law. The inference dra wn from the power to bail stands on the same footing with that drawn from the power to discriminate between grand and petty larceny. It may not be improper however to add here, that this power to bail was not given to the examining courts at the time nor for the reason mentioned in the argument: those courts have possessed that power ever since the year 1777. Vide Chancellor’s revisal, chap. 17, sect. 58, p. 74. The history we have had of this law, does not, it is believed, impugn in the least the construction given to it by the court. Rrom the passage of the first act upon the subject up to the year 1786, we know of no judicial decision upon this point. Ror although Judge Mercer did in the discussion of Sorrell’s case, mention the case of the king against Davis, yet he did not make even a parol report of the circumstances of the case. He did not tell the term, nor even the year when it was adjudged, nor, which is very remarkable, did any of his 246 brother "’‘judges, not even the judge who agreed with him, rely upon it, or mention it in their arguments : such a vague account from mere memory, at a distant day, cannot be considered as authority, especially as it was not so considered b3' the court to whom it was mentioned.
Sorrell’s case, then, was, so far as the court can know, the first that has occurred upon this point, and that case settled the law as now contended for by the attorney general. This was the opinion of the general court, and not one of its branches, and it is a mistake to say that Judge Tazewell gave no opip *65 ion. He did give a pointed and able one. It is true, he added, if the question was moved again, he would be willing to hear it argued.
Neither was this a sudden opinion, given without consideration. The question was moved upon the fourth day of the court when the indictment was sent up to the grand jury. It was again discussed and decided on the sixth day of the court when the prisoner had his trial.
This construction has, as we are told, been sustained by the District Courts in Bailey’s and Shannon’s cases. So that there have been three judicial opinions in favour of it, and none that we know of against it.
From the year 1786 to the year 1804, eighteen years, *thelegislature left this law, thus explained and thus executed, untouched. If it had deeme'd this construction incompatible with the public good, would it have done so ? Certainly it would not.
In the year 1804, the legislature did pass a new statute on the subject of examining courts. But was it moved to do so, in order to give them this discriminating power? If that was its intention, why did it not do so in express words? Why was it left to intendment and doubtful construction? The legislature knew that this power had been denied to the examining courts for eighteen years, why then did it not put the question beyond doubt? For the best of all possible reasons; it did not intend to disturb it.
The truth is, that all the judges in Sorrell’s case, and most of the judges and lawyers in the state, had always admitted that these courts did possess the power of entire acquittal. This opinion had, however, been lately called in question by a book of respectable authority, and had in Shannon’s case been actually resisted by a judge of the general court. It was then to put an end to that question, and to secure to those courts that general power of acquittal which almost every body thought they did possess, that this third section of the act of 1804, was inserted. 248 ^Another argument was pressed upon the court in a late stage of the cause, drawn from the 12th section of the penitentiary statute. It will not however be contended that if the legislature pass a law upon a supposition that that is law which is not, this mistake will be equal to an enacting clause, and call a new law into existence—if then the examining courts did not before possess this discriminating power, this section could not give it to them. But it is a mistake to suppose that when the legislature speak of a person’s being charged with a crime, a charge made by a grand jury or examining court is necessarily meant. The word charge is often used to designate a charge made upon oath before a justice of the peace, and it is so used in both of the acts of assembly respecting examining courts. The real intention of the legislature seems to have been, that when a man was sent forward for homicide, and the attorney to whom the law directs the depositions to be sent, should perceive thdt the evidence charged him with involuntary manslaughter only, he should be at liberty to proceed in the manner pointed out by that section.
Upon the whole the court is unanimously of opinion, that a court of examination hath not power to acquit a prisoner charged before it with murder, of the murder with which he stands so charged, and to remand the said prisoner to be tried in the superior court 249 for manslaughter *on account of the same homicide; and that if such court does make such a discrimination the prisoner is not thereby discharged from any part of the felonious homicide with which he stood charged, but may be indicted for murder before the superior court.
Judge White at the close of his opinion, added, that there was one point which the court had not yet undertaken to decide; viz. whether the commonwealth could mend its pleadings, that is, withdraw its demurrer and put in a new plea. This point was waived by the bar, and it was understood to be one which would fairly lay over for the court below.
The following order was then entered on the record, and directed to be certified to the Norfolk circuit court.
The superior court of Norfolk county having with the assent of the prisoner, Samuel Myers, adjourned to the general court the following questions of law, viz.
First: Whether a court of examination hath power to acquit a prisoner charged before them with murder, of the murder with which he stands so charged, and to remand the said prisoner to be tried in the superior court for manslaughter on account of the same homicide.
^Secondly : Whether a prisoner acquitted by the examining court of murder and remanding to be tried before the superior court for manslaughter on account of the same homicide, but indicted in the said superior court for murder on account of the same homicide, is entitled to be bailed by such superior court after the discharge of the grand jury who found no other indictment against him.
And any and all the other questions of law arising upon the pleadings.
The court having maturely considered the said questions of law after the argument of the attorney general and council for the prisoner, are unanimously of opinion, and do decide :
First, That a court of examination have not power to acquit a person charged before them with murder, of the murder with which he stands so charged, and to remand him to be tried for manslaughter in the superior court on account of the same homicide.
Secondly, It is further the unanimous opinion of the court, that the examining court being legally incompetent to control the proceeding of the superior court upon the case of the prisoner remanded by the exam-251 ing court to *the superior court for a felonious homicide, it was lawful to indict the prisoner for murder, notwithstanding the discrimination by the examining court as to the grade of homicide, and being so indicted, the said prisoner was not *66 entitled to be bailed on the ground of no indictment being found against him for the offence of manslaughter.
The prisoner having pleaded three pleas in bar, by the leave of the court, in substance as follows : « ' .
1st. That the prisoner was charged with the murder of Richard Bowden, examined for the same before a court legally constituted and found not guilty of the murder, and that he ought not to be remanded to the superior court for trial therefor.
2d. That the prisoner was charged with the murder of Richard Bowden, examined for the same before a court legally constituted, and found not guilty of the said murder, and that he ought not to be remanded to the superior court therefor, but ought to be tried for the offence of manslaughter in the superior court of law to be held at Portsmouth, &c.
3d. That he was duly charged, examined and tried for the murder of Richard Bowden before a court legally constituted, and upon this trial and examination was duly 252 xand legally acquitted of the said murder and felony with which he stood charged, and was adjudged by the court not guilty thereof : To each of which pleas, the-attorney for the commonwealth demurred generally and the prisoner filed a joinder thereto, and the matters of law arising thereupon having been duly considered ; the court doth decide:
That the first plea affording matter in bar of the indictment, and well pleaded, the demurrer thereto ought to be overruled, and the plea held good.
That the second plea, stating a proceeding by the examining court which the court has decided, in answer to the first question, tobe one exceeding the jurisdiction of that court, does not afford matter in bar of the indictment, and therefore as to that plea the demurrer ought to be held good and the plea overruled.
• That the third plea affording matter in bar of the indictment and well pleaded, ought to be held good, and the demurrer thereto overruled—Which is ordered to be certified to the Superior Court of Norfolk county.
During the arguments of the above case the two cases of Sorrell and Bailey were so 253 often referred to, that it is *thought adviseable to annex them hereto. The former was reported in MS. by Saint George Tucker, Esq. whilst he was at the bar, and a copy of his report was shewn to the general court during Myer’s trial; the latter was also reported by him : it will be observed that Bailey’s case was not quoted or relied upon as authority, it having been decided by a tribunal inferior to the general court.